COMMONWEALTH vs. BRYAN A. DYER.

Suffolk. March 8, 1983. — July 13, 1983.

Present: HENNESSEY, C.J., WILKINS, LIACOS, NOLAN, & O'CONNOR, JJ.

*Joint Enterprise. Practice, Criminal,* Instructions to jury. *Identification.*

Where the nature of the evidence at the trial of a murder case may have suggested to the jury the possibility that there was more than one assailant, the judge did not err in instructing the jury on joint enterprise. [682-683]

At the trial of a murder case there was no error in the judge's failure explicitly to mention intent in the portion of the charge that dealt with joint enterprise where elsewhere in the charge the judge had accurately explained the mental state required for the crimes in question. [683-684]

The judge in a murder case did not err in concluding that there was no police misconduct respecting identification of the defendant by a witness who had seen television and newspaper coverage of the defendant's arrest. [684]

The defendant in a murder case was not entitled to relief under G. L. c. 278, § 33E, based on the admission in evidence of certain identification testimony which the defendant claimed was unreliable because the witness had not had a sufficient opportunity to observe the person leaving the scene of the crime, because the witness was motivated to manufacture the identification by a reward offered in the case, and because the witness had seen television and newspaper coverage of the defendant's arrest. [684-685]

INDICTMENTS found and returned in the Superior Court Department on October 7, 1980.

The cases were tried before *Pierce,* J.

*Henry D. Katz (Alan Chapman* with him) for the defendant.

*Jeremiah Sullivan,* Special Assistant District Attorney (*Carol Anne Fagan & Thomas F. Reardon,* Assistant District Attorneys, with him) for the Commonwealth.

O'CONNOR, J.  The defendant, Bryan A. Dyer, was convicted by a jury on four indictments for murder in the first degree and on indictments for armed robbery and unlawful possession of a firearm.  The defendant appeals from these convictions on the grounds that the trial judge committed reversible error in instructing the jury on the law of joint enterprise and in admitting unreliable identification evidence.  We find no merit in the defendant's contentions and no ground for reversal under G. L. c. 278, § 33E.  We affirm the convictions.

The jury could have found the following:  Shortly after 8:20 A.M., on September 22, 1980, the bodies of four men were found in the mechanics' room at the rear of Sammy White's Brighton Bowl in the Brighton section of Boston. The four victims, George Hagelstein, Donald Doroni, Brian Cobe, and David Cobe, all employees of the bowling alley, were lying on the floor with their hands restrained behind their backs.  Each had received one head wound from a .38 caliber handgun and multiple blunt injuries to the head. Three of the men were dead when discovered.  Brian Cobe died soon after at a hospital.  In the office of the bowling alley, papers and the cash drawer were on the floor and the safe had been opened.  Approximately $4,800 was missing.

Just before the bodies were discovered, John Flynn and Michael Fabbri left their home in Brighton and proceeded to drive east on Soldiers Field Road toward downtown Boston.  Soldiers Field Road is a four-lane highway, two lanes in each direction.  The traffic was light and the weather was clear.  Fabbri drove at a speed of from thirty-five to forty miles an hour.  Flynn sat in the front passenger seat.

At approximately 8:10 A.M., they approached Sammy White's Brighton Bowl which was on their right.  Flynn saw a green automobile being accelerated from the rear of the bowling alley parking lot toward the road.  As Flynn and Fabbri approached the exit of the parking lot, the green car pulled out in front of them, heading in the same eastward direction.  Both cars swerved from the right eastbound lane to the left eastbound lane.  The green automobile then pulled back into the right lane.

Flynn and Fabbri, while still in the left lane, pulled up beside the green car. The cars were about five feet apart and remained parallel for about five seconds. Flynn had intended to make an obscene gesture, but after he looked at the other driver for about three seconds Flynn said to Fabbri, "Let's not screw around with this guy." The green car disappeared off the highway onto an exit ramp to the right.

The following day, having heard of the murders committed at the bowling alley, Flynn called the Boston police to describe the incident on Soldiers Field Road. He described the driver of the green car as "a white male, looked weird, dark hair, frizzy, dark complexion, possibly Italian or Greek, hair was close cropped, age somewhere between 30 and 40 years, having a stubble beard." He described the car as large and light green, possibly a Ford. Two days later, the police called Flynn for another description, at which time he described the color of the car as "lighter than pea green."

On the evening of October 1, Flynn was watching a news program on television at home when he saw the defendant's picture on the screen as part of the coverage of his arrest. Flynn immediately called to Fabbri in the next room and said, "There's the guy who cut us off." The next morning, Flynn read various newspapers in which he saw the defendant's picture. He telephoned the police. Two officers interviewed Flynn at work and showed him thirty to forty photographs. He selected two of them as being photographs resembling the man whom he had seen in the car outside Sammy White's Brighton Bowl. Both were of the defendant. Sometime after Flynn first telephoned the police on September 23, but before October 2, he learned that there was a reward posted for information leading to the arrest and conviction of the perpetrator(s) of the crimes.

In 1973, the defendant had been employed as a maintenance worker at the bowling alley, the same position held by Brian and David Cobe at the time of their deaths. The defendant had been seen at the bowling alley in August, 1980, and also three days before the murders, at which time

he spoke with the victim Doroni about regaining his employment there.

At the time of the robbery and murders, the defendant was employed as a driver for the Green Cab Company of Somerville. He owned a dark green 1977 Buick automobile, and lived in the Somerville Y.M.C.A. The police searched the defendant's car and room, pursuant to warrants. They discovered an undischarged bullet in the glove compartment of the car and a pink money band in the trunk. They took a pair of sneakers from the defendant's room.

The four victims died as a result of bullet wounds. The bullets were removed from the bodies and compared with the bullet found in the defendant's car. They were of the same caliber and design: .38 caliber, copper covered, hollow point bullets. Microscopic examination revealed that they had an identical pattern of striated markings. All guns imprint a unique pattern of markings on bullets that pass through them, with the exception that the markings made on a bullet manually cycled through a gun are less prominent than those imprinted on a bullet that has been fired from a gun. The jury could infer that the defendant was in possession of a bullet that had been in the murder weapon. The defendant was seen with a .38 caliber automatic handgun in August, 1980, and again on September 18 or 19. Another driver employed by the Green Cab Company had purchased fifty hollow point bullets for him within two years before the murders.

The pink paper money band found in the trunk was microscopically and visually identical to those used at Sammy White's Brighton Bowl to wrap the money stolen from the safe. Roofing tar adhered to the sole of one of the defendant's sneakers. The tar was the same type as that found on the ground outside the bowling alley.

Early on the morning of the robbery and murders, the defendant did not drive his car to work, as was his custom. He was driven to work by a fellow taxi driver. The jury could infer that the defendant left his car at the Somerville Y.M.C.A. Later, at about 7 A.M., the building superintend-

ent at the Somerville Y.M.C.A. heard radio transmissions and a dispatcher's voice emanating from a Green Cab taxi parked in the Y.M.C.A. parking lot. Sometime between 8:15 A.M. and 8:45 A.M., the superintendent was outside the building, trimming the hedges, when he saw the defendant drive up in his car. Thus the jury could also infer that the defendant had earlier exchanged his taxi for his car at the Y.M.C.A., and was in possession of his green car at the time of the robbery and murders. Soon the defendant entered the Y.M.C.A., from which he emerged fifteen to twenty minutes later carrying a plastic trash bag which he threw into the trunk of his car, and drove away. The superintendent went inside at about 9 A.M.

The log book of the Green Cab Company did not indicate that the defendant took any fares from 6 A.M. to 8:18 A.M. on the morning of the murders. Between 8:15 and 8:20 A.M., he radioed the dispatcher to indicate that he was at the Davis Square taxi stand. However, the defendant was not at that location at that time.

At approximately 9 A.M., the defendant turned in his taxi, although he ordinarily worked until 4 P.M. He told the dispatcher he was sick, but told another driver that he had something to do. Before he left his taxi, the defendant was seen checking the front and back seats. Afterward he was seen walking down the street toward the Y.M.C.A., which was about one mile from the dispatcher's office.

The defendant almost never took a day off from work, and usually arrived early. However, he did not record a fare until 7:28 A.M. on the morning of September 19, which was the morning he talked to Doroni at the bowling alley. On September 18, the defendant had asked the owner to allow him to take the next day off and when she refused he became enraged.

In addition, the defendant took the day off on September 23, and was late for work each day he worked until his arrest on October 1. When questioned by the police, the defendant denied owning a car and having been at the bowling alley on September 19.

On three occasions during the two weeks before the robbery and the murders, the defendant had paid only a portion of the $28 daily rental fee for his taxi, owing the company the balance. The defendant did not make a full payment on his automobile loan for the month of August. The September payment was due on the eighteenth and was made on the twenty-fourth, two days after the robbery and murders. During the week before his arrest the defendant paid two additional weeks' rent at the Y.M.C.A. in advance, and bet on races at the Wonderland race track in Revere. He paid a fellow taxi driver for a ride to the dispatcher's office and he inadvertently revealed two or three $100 bills in his hand. At least two $100 bills were stolen from the bowling alley.

The defendant's primary argument on appeal is that the judge committed reversible error in instructing the jury on the law of joint enterprise. This portion of the defendant's argument is twofold. He argues first that a joint venture charge never should have been given in this case because there was no evidence that more than one person was involved in the crime. Secondly, he argues that the charge itself was an erroneous statement of the law.

A jury instruction on joint enterprise was appropriate. Each of the victims had been shot in the head and also had been beaten on the head with a blunt instrument. After drawing attention to these facts during cross-examination of two expert witnesses called by the Commonwealth, defense counsel repeatedly asked the witnesses whether more than one person was involved in committing the crimes. He asked one of the witnesses, "[I]s it not more probable to conclude that the crime was committed by more than one individual?" Neither witness offered an opinion on the subject.

Nonetheless, during his charge to the jury, the judge commented that "some suggestion has been made that perhaps these crimes were committed by more than one person. This raises the concept known as the law of joint enterprise." He then instructed the jury as follows: "In order to find the defendant guilty of a crime or crimes, under this theory of the law, the Commonwealth must prove two things beyond a rea-

sonable doubt. First, that the defendant associated himself with a criminal venture. And, second, that the defendant participated to some extent in the commission of the crime or crimes. In short, in order to convict a defendant of the crimes with which he is charged, you must find beyond a reasonable doubt that he actively or that he was actively engaged in committing these crimes, irrespective of whether other persons were or may have been involved."

Because the nature of the evidence may have suggested to the jury the possibility that there was more than one assailant, the judge was justified in giving a joint enterprise instruction. It was appropriate for the judge to explain to the jurors the legal significance of whether the assailant acted alone or in concert with others, and to tell them that it was not essential to the Commonwealth's proof of the crimes charged that the defendant acted alone.

The elements of the crimes with which the defendant was charged are not determined or influenced by whether the defendant was the sole perpetrator or only one of several participants in the crimes. The evidence was sufficient to show that the defendant was at least a participant, even if he was not the sole perpetrator, and that he possessed the state of mind required for guilt. Nothing further was required for conviction. The fact that the evidence did not warrant a finding that others participated in the crimes, therefore, has no significance.

The defendant argues not only that a joint enterprise instruction should not have been given, but also that the instruction that was given permitted the jury to infer that they could convict the defendant of crimes without finding that he acted with the legally requisite intent. The "charge is to be read in its entirety. It is the impression created by the charge as a whole that constitutes the test." *Commonwealth* v. *Pinnick*, 354 Mass. 13, 15 (1968). The concept of intent may be conveyed to the jury in a variety of ways. *Commonwealth* v. *Whitehead*, 379 Mass. 640, 650-652 (1980). The judge did not explicitly mention intent in the portion of the charge that dealt with joint enterprise. How-

ever, elsewhere in the charge the judge accurately explained the mental state required for the several crimes, and, in discussing joint enterprise, he explained that the Commonwealth had the burden of proving that the defendant associated himself with the crimes, that he participated in them, and that he was actively engaged in committing them. In the context of this trial, the charge as a whole was sufficient to convey to the jury that in order to convict the defendant they had to find that he acted with criminal intent. There was no error in the charge.

We turn now to the defendant's assertion that the identification testimony of John Flynn should have been suppressed. The defendant filed a motion to suppress Flynn's identification of the defendant on the ground that he "was identified by [Flynn] through television media during pre-trial proceedings which [were] so unnecessarily suggestive and conducive to irreparable mistaken identification" that admission of that evidence was unconstitutional. At the hearing on the motion, the defendant attempted to show that the television and newspaper coverage of the defendant's arrest was prompted by the police, and argued that such prompting constituted police misconduct, justifying suppression of the identification. The judge found no police misconduct, and thus declined to suppress the testimony. The defendant does not challenge the judge's findings. In the absence of police misconduct the judge's ruling was correct. *Commonwealth* v. *Venios,* 378 Mass. 24, 26-27 (1979). *Commonwealth* v. *Botelho,* 369 Mass. 860, 866 (1976).

The defendant argues for the first time on appeal that even in the absence of police misconduct the judge should have ruled that Flynn's identification was unreliable, and therefore inadmissible, and that failure to have done so constituted a denial of due process. He argues that Flynn's testimony was unreliable because he had neither the opportunity nor the motive to examine the other driver on Soldiers Field Road, that Flynn was motivated to manufacture the identification because of the reward offered in the case, and

that Flynn had an opportunity to manufacture the identification of the defendant as a result of having seen his picture on television and in the newspapers.

Because these contentions are presented for the first time on appeal, we consider them only in conjunction with our duty under G. L. c. 278, § 33E, to consider the whole case to determine whether justice requires a new trial of the indictments for murder in the first degree or the entry of verdicts of a lesser degree of guilt on those indictments. We have reviewed the whole case. We conclude that Flynn's reliability was for the jury, and that no basis for relief under G. L. c. 278, § 33E, has been demonstrated.

*Judgments affirmed.*