COMMONWEALTH vs. WILLIAM DELLO IACONO.

Middlesex. February 4, 1985. — May 17, 1985.

Present: GREANEY, C.J., KAPLAN, & BROWN, JJ.

*Joint Venture. Practice, Criminal,* Instructions to jury, Argument by pros-
ecutor, Sentence. *Assault by Means of a Dangerous Weapon.*

Where testimony of a witness at the trial of a defendant charged with armed
    assault suggested that there were two persons in the automobile that
    sped away from the scene immediately after the shooting, the judge did
    not err in instructing the jury on joint enterprise. [86]
At the trial of armed assault charges, the judge's instructions to the jury
    sufficiently informed them that they could find the defendant guilty on
    a theory of joint venture only if they found that the defendant knew his
    accomplice had a weapon. [86-87]
Evidence at the trial of an armed assault case warranted a finding that the
    defendant had knowledge of a dangerous weapon. [87-88]
Although in his closing argument the prosecutor in a criminal case used
    the expressions "I suggest" and "I think," the argument as a whole did
    not amount to an improper expression of the prosecutor's belief in the
    defendant's guilt. [88]
A judge properly imposed consecutive sentences on a defendant convicted
    on two indictments for assault by means of a dangerous weapon which
    arose from a single incident during which shots were fired at the home
    of the two victims while both were inside. [89]

INDICTMENTS found and returned in the Superior Court De-
partment on September 29, 1982.

The case was tried before *Kenneth P. Nasif*, J., sitting under
statutory authority.

*Alfred Paul Farese* (*Harris Krinsky* with him) for the defend-
ant.

*Fredric Lee Ellis*, Assistant District Attorney, for the Com-
monwealth.

KAPLAN, J. Katherine Dello Iacono, who had been married
to the defendant, William Dello Iacono, for thirteen years,

was divorced from him in August, 1982. She was living with her parents, Robert and Katherine Houldsworth, in their two-family house in Everett; the parents occupied the ground floor apartment, she and her children the apartment above. About 9:00 P.M., September 22, 1982, while the Houldsworths were babysitting at the house for their grandchildren, their daughter Katherine being out with a girl friend, Robert Houldsworth responded to a telephone call. It was the defendant. He complained about his former wife's going out in the evening and the Houldsworths' taking care of the children. He said he was not afraid of the "murdering" Everett police; if the police tried to take him from his home or arrest him, they would need at least nine men because he had "fire power"; he had a nine millimeter automatic weapon and an "MO-6."[1] He was not "high," he said, but by 11 or 12 o'clock he would be. He said he would sit up and watch outside the house. When Katherine came home he would decide whether "to put two shots in her" or overshoot and scare her.

Shortly after midnight Robert Houldsworth called the Everett police, and with his wife and the two children went into the ground floor living room to await the police. About 12:30 A.M. the phone rang and Katherine Houldsworth answered. The defendant asked if his wife had come home, and on being told, "No," he said, "I'm going to kill you," and rang off.

Some fifteen minutes later shots were fired in rapid succession outside the house, entering the Houldsworth's living room and adjacent dining room, shattering two windows and lodging in the walls of those rooms and in the kitchen. (No shots entered the apartment above.) At the time Robert Houldsworth was sitting in the living room by a window and Katherine Houldsworth was in the hallway between the living room and kitchen. Robert, looking out a living room window immediately following the shooting, saw the rear of a small red car as it was leaving the scene.[2] William Lunt, from his third floor apartment

---

[1] The record does not elucidate the meaning of "MO-6."

[2] A few days earlier Robert and Katherine Houldsworth had noticed the defendant driving a red car.

across the street, heard five or six gunshots and, under good street lighting with an unobstructed view of the Houldsworth house, saw a small red four-door car moving quickly up the street. He saw two arms protruding from the vehicle, one from the front window on the driver's side, the other from the rear window on that side. Neither Lunt nor Robert Houldsworth was able to identify anyone in the vehicle.

The police arrived after another call to them. They found six discharged bullet casings on the street and sidewalk about ten feet from the house. These were later typed as nine millimeter cartridge casings; the cartridges had been fired from the same weapon. Three bullet remains, found respectively in the living room, dining room, and kitchen, were .38 caliber jacketed spent projectiles but it was not possible to determine the type of weapon from which they had been fired.[3]

Katherine Dello Iacono came home around 2 A.M., unharmed. About 12:30 P.M. that day she had a phone call from the defendant, overheard on an extension phone by Inspector Henry Meoli. The defendant said, "I didn't do a good enough job last night, but I'll be back tonight." That afternoon, the defendant, who sometime in the morning had booked a flight to Florida under the name of William Sarno, was arrested at Logan Airport while he was waiting in the Eastern Airlines reservation area.[4]

Inquiry disclosed that about 10:30 that morning (September 23) the defendant returned a red Ford Escort station wagon to a car agency in Saugus. He had rented the car on September 17. The defendant asked the agency manager to hasten the closing out procedure because "he had to leave town in a hurry."

The foregoing is the case, in substance, as the jury could see it at trial[5] in finding the defendant guilty on three indictments:

---

[3] Expert testimony suggested that .38 caliber bullets could be fired from a weapon with a nine millimeter bore, at least if the weapon was modified.

[4] Inspector Meoli on the extension phone heard the sound of a plane as a background noise. There was no reservation in the name of Dello Iacono at any of several airlines, but there was a better result for "Sarno," a name that Katherine Dello Iacono said her husband had used in the past.

[5] The defendant offered testimony by his niece, Joanne Dello Iacono, that

two for assault by means of a dangerous weapon upon, respectively, Robert and Katherine Houldsworth (G. L. c. 265, § 15B), and one for malicious destruction of personal property (G. L. c. 266, § 127). The judge sentenced the defendant to consecutive terms of three to five years on the assault convictions, and three to five years on the conviction for malicious destruction, to be served concurrently with the first assault sentence.[6]

1. Over the defendant's objection, the judge at the prosecutor's request instructed the jury about joint venture.[7] Although the prosecution had not centered attention on that hypothesis, it was right for the judge to charge upon it if the evidence allowed. See *Commonwealth* v. *Dabrieo*, 370 Mass. 728, 745 (1976); *Commonwealth* v. *Dyer*, 389 Mass. 677, 683 (1983). The testimony of William Lunt supported an inference, albeit not an inescapable one, that there were two persons in the red car,[8] and that one of them, if there were two, was the defendant. "It was appropriate for the judge to explain to the jurors the legal significance of whether the assailant acted alone or in concert with others, and to tell them that it was not essential to the Commonwealth's proof of the crimes charged that the defendant acted alone." *Commonwealth* v. *Dyer, supra* at 683.

On appeal the defendant complains that the instruction given did not state expressly that to fasten accessorial responsibility

---

he was with her at her house from 12:15 to 3:30 A.M. on September 23. The defendant testified. He acknowledged the telephone conversation with his wife and that he had booked a flight under the name Sarno.

[6] The jury acquitted the defendant on two indictments charging armed assault with intent to murder (G. L. c. 265, § 18). On an indictment for unlawfully carrying a firearm (covered by G. L. c. 269, § 10[*a*]), the judge allowed a motion for a required finding of not guilty on the ground that the indictment was not properly drawn and referred to an inapposite statute (G. L. c. 140, § 10[*a*]).

[7] Initially the defendant objected to any joint venture charge; after the judge's instructions he objected to any joint venture charge as related to the assault with intent to murder, not the assaults with a dangerous weapon, on which the jury convicted.

[8] We may note the testimony of Inspector Meoli that Lunt told him at first that he had seen two individuals in the car. This was not objected to, although hearsay, and thus gives substantive amplification to Lunt's testimony about the protruding arms. See *Commonwealth* v. *Reynolds*, 338 Mass. 130, 135-136 (1958); Liacos, Massachusetts Evidence 74-75 (5th ed. 1981).

upon him he must be shown to have had knowledge that the accomplice possessed a weapon. See *Commonwealth* v. *Watson*, 388 Mass. 536, 544 (1983). However, the defendant did not request such an instruction or object to its omission. He was not relieved of the burden of registering an objection to the supposed error in the charge as delivered, by the fact that he had protested the giving of any charge. See *Betty Corp.* v. *Commonwealth*, 354 Mass. 312, 321 (1968). So the question reduces to whether the instruction as given created "a substantial risk of a miscarriage of justice" under the rule of *Commonwealth* v. *Freeman*, 352 Mass. 556, 564 (1967), and in that connection we examine the charge as a whole. See *Commonwealth* v. *Pickles*, 393 Mass. 775, 776 (1985). Here the judge charged, correctly, that the joint venturer must participate to some extent in the physical commission of the crime and share with his accomplice the intent intrinsic to the crime; he also defined the crime of armed assault as comprising the specific intent to put another in fear by means of a dangerous weapon. The jury were thus sufficiently informed that they could find the defendant guilty on a theory of joint venture only if they found that he knew his accomplice had a weapon. The present case is similar to *Commonwealth* v. *Brown*, 392 Mass. 632, 642-643 (1984), where the charge on the physical and mental elements of criminal complicity in the armed robbery was held adequately informing. See also *Commonwealth* v. *Dyer*, 389 Mass. at 683-684. Our case differs from *Commonwealth* v. *Watson*, 388 Mass. 536, 544-546 (1983), in which the instructions, considered as a whole, left the impression (again in respect to armed robbery) that it did not matter whether the defendant knew that the accomplice had a gun.[9]

To turn from the instructions to the facts, there was strong evidence that the defendant had knowledge of a dangerous weapon. Cf. *Commonwealth* v. *Brown*, 392 Mass. 632, 634-635 (1984); *Commonwealth* v. *Brown*, 394 Mass. 510, 516 (1985); *Commonwealth* v. *Walker*, 17 Mass. App. Ct. 194,

---

[9] Both *Brown* and *Watson* were decided by reference to a "miscarriage of justice" standard.

197-198 (1983). Compare *Commonwealth* v. *Hennessey*, 17 Mass. App. Ct. 160, 163-165 (1983). He mentioned a gun in the first telephone call; the casings found corresponded to the gun; murder was threatened in the second phone call; hard upon the threat were the gunshots and the fleeing car consistent with the rented car; the third call confirmed that the "job" had been done. There was abundant evidence that the defendant was guilty either in the direct or accessorial sense: in all likelihood justice did not miscarry.[10]

2. Another contention is sought to be made on this appeal, although not raised by objection at trial: that the prosecutor in his closing statement suggested, improperly, that he believed the defendant was lying and was guilty of the crimes. The *Freeman* principle applies. See *Commonwealth* v. *Fitzgerald*, 376 Mass. 402, 416 (1978). We have examined the questioned remarks of the prosecutor, as we should, in the context of his closing statement as a whole, and conclude that, despite the usages "I suggest" and "I think," the jury would understand that the prosecutor was suggesting, quite permissibly, that there was evidence from which the jury could find the defendant's testimony not credible and the evidence sufficient to warrant verdicts of guilty. See *Commonwealth* v. *Ferreira*, 381 Mass. 306, 316-317 (1980); *Commonwealth* v. *Drayton*, 386 Mass. 39, 52-53 (1982); *Commonwealth* v. *Gaeten*, 15 Mass. App. Ct. 524, 526-527 (1983). Contrast *Commonwealth* v. *Villalobos*, 7 Mass. App. Ct. 905 (1979). If any juror understood the prosecutor's statements as expressing his personal belief, the judge's charge would dispel any notion that that belief should count toward conviction. See *Commonwealth* v. *Fitzgerald*, 376 Mass. at 419.[11]

---

[10] The defendant also claims error (not preceded by objection at trial) in the judge's charge on malicious destruction of personal property. We do not find that the charge removed any essential element of the alleged crime from the jury's consideration.

[11] The prosecutor's remark, "when he fired shots into the house," again would be understood as a possible inference from the evidence, not as an assertion to be accepted as true.

3. By motion under Mass.R.Crim.P. 30(a) and (b), 378 Mass. 900 (1979), the defendant challenged the imposition of successive sentences upon the assault convictions. The motion fails by reference to the recent decision of *Commonwealth* v. *Levia*, 385 Mass. 345, 347-351 (1982). There Levia, masked and armed, pointed a gun at two employees of a store owner and forced each of them to hand over money belonging to the owner. Two indictments for masked armed robbery naming the employees, respectively, as victims were handed up and tried together, and successive sentences were imposed on the guilty verdicts. It could be argued with some plausibility that the crux was the larceny from the owner, so that there was only one offense; but the court, considering the legislative design, held that the number of persons intimidated measured the number of offenses. Influential was the text of the defining statute which spoke of the "person" as the object of protection; so also the fact that armed robbery falls under the statutory heading "Crimes Against the Person." Successive sentences are more readily justified in the present case, for the statutory indicia just mentioned exist here, and there is no plausible factor looking the other way. See also *Commonwealth* v. *Meehan*, 14 Mass. App. Ct. 1028 (1982) (two consecutive sentences for vehicular homicide); *Commonwealth* v. *Davila*, 17 Mass. App. Ct. 511, 515 (1984) (three consecutive sentences for second degree murder). Decisions in other jurisdictions are in accord. *Barringer* v. *United States*, 399 F.2d 557, 558 (D.C. Cir. 1968) (per curiam), cert. denied, 393 U.S. 1057 (1969). *United States* v. *Hodges*, 436 F.2d 676, 678 (10th Cir.), cert. denied, 403 U.S. 908 (1971). *Neal* v. *State*, 55 Cal.2d 11, 20-21 (1960) (Traynor, J.). *State* v. *Bradley*, 215 Kan. 642, 648 (1974). *State* v. *McCarroll*, 337 So.2d 475, 478-479 (La. 1976). *State* v. *Rieck*, 286 N.W.2d 724, 726-727 (Minn. 1979). *State* v. *Montalvo*, 324 N.W.2d 650, 652 (Minn. 1982).

As *Levia* points out, the basic question is what the Legislature has delineated as a single offense. Here a rule of offense-per-person does not yield an oppressive result; if, in relation to different facts, the rule would produce bizarre or unjust punishment,

the courts may be expected to react. 385 Mass. at 351. *Levia* adds that the problem of successive sentences is to be distinguished from that of repeated prosecutions for offenses deriving from the same criminal "transaction." *Ibid.*; and see *Ashe* v. *Swenson*, 387 U.S. 436, 453-460 (1970) (Brennan, J., concurring).

*Judgments affirmed.*