COMMONWEALTH *vs.* ANTONIO FERRER ·

No. 97-P-1390.

Bristol. February 9, 1999. - August 30, 1999.

Present: KASS, KAPLAN, & LAURENCE, JJ.

*Homicide. Practice, Criminal,* Required finding, Admissions and confessions, Voluntariness of statement. *Witness,* Impeachment.

Evidence at the trial of a murder indictment, including reasonable inferences, warranted the jury's conclusion beyond a reasonable doubt that the defendant had fired the shot that killed the victim. [646-647]

At the trial of an indictment for murder, the judge, after ordering suppressed the fourteen year old defendant's incriminating statements to police where he had not been given an opportunity first to consult with an adult, correctly ruled that the defendant's statements were voluntarily made for purposes of the Commonwealth's impeaching the defendant with them should he take the stand to testify. [647-649]

INDICTMENT found and returned in the Superior Court Department on January 23, 1992.

The case was tried before *John M. Xifaras,* J.

*John H. LaChance* for the defendant.

*Christopher M. Markey,* Assistant District Attorney, for the Commonwealth.

KASS, J. Antonio Ferrer was convicted of second degree murder. On appeal he argues that the trial judge erred (1) in denying a motion for a required finding of not guilty; and (2) in ruling, on the authority of *Commonwealth* v. *Harris,* 364 Mass. 236, 241-242 (1973), that the prosecutor could impeach the fourteen year old defendant with statements that the trial judge had ordered suppressed as to the government's case-in-chief.

1. *Facts.* On the basis of the evidence taken in the light most favorable to the Commonwealth, *Commonwealth* v. *Latimore,* 378 Mass. 671, 676-677 (1979), the jury could have found facts as follows. On January 2, 1992, the defendant Ferrer, together

with Andre Cortes, walked into a Dunkin' Donuts shop in New Bedford and ordered coffee, hot chocolate, sandwiches, and two donuts. While Donna Bertozzi, the server, filled the order, Cortes accosted her, thus: "You're cute . . . I'd like to lick you from head to toe." Cortes followed up with a question about when Bertozzi went off shift and added, "Well, we'll be back." The two paid for their food and took it into a red Chevrolet automobile in the parking lot, Cortes getting in on the driver's side and Ferrer on the other. Bertozzi, because she "was scared," told two regular customers, one of whom was Joseph Freitas, the eventual victim, what Cortes had said.

Eight minutes later, Ferrer returned and ordered two more croissants. Freitas and Ferrer exchanged stares, which led to words (Ferrer: "Do you have an eye problem?" Freitas: "No, do you?") and a fight. Ferrer said, "Let's take this outside"; they did. Outside Freitas shoved Ferrer to the ground. Ferrer got up and ran to the passenger side of the red Chevrolet. The car backed up about one hundred feet, the dome light on. Cortes was at the wheel; Ferrer looking down and to his right. After about two minutes, the dome light went off and the Chevrolet approached the entrance to the shop, where Freitas stood. As the car slowed to a stop, the passenger side faced the entrance. One shot rang out and Freitas fell, fatally wounded. After the shot, the defendant leaned back in the passenger seat; Cortes had a hand on the wheel and was looking to his right. The Chevrolet sped off. At the scene, police found a .22-caliber shell casing and a sandwich box with Ferrer's fingerprints on it. Freitas's mortal wound had been inflicted by a .22-caliber bullet.

2. *Denial of required finding of not guilty.* Although there were percipient witnesses, no one actually saw the firearm in the hands of Ferrer or saw a gunshot flash out the passenger window of the Chevrolet. On that basis, the defense argues that the evidence pointed equally at Cortes as the trigger man. In order to get over the bar described in *Commonwealth* v. *Latimore, supra,* the Commonwealth need not exclude all other possibilities as to how the crime was committed. See *Commonwealth* v. *Leach,* 156 Mass. 99, 101-102 (1892); *Commonwealth* v. *Fancy,* 349 Mass. 196, 200 (1965); *Commonwealth* v. *Holmes,* 32 Mass. App. Ct. 906, 907 (1992). It had been Ferrer, not Cortes, who had been in a confrontation with Freitas and had been bested outside the Dunkin' Donuts. Ferrer, more than Cortes, could be found to have had a motive

to shoot Freitas. See *Commonwealth* v. *Robinson*, 30 Mass. App. Ct. 62, 72 (1991). Cortes was seen driving the car. To shoot out the passenger window, he would have had to shoot in front of Ferrer's body, a possible but unlikely maneuver. It was Ferrer, not Cortes, who fled from Massachusetts to Florida, a fact from which the jury could infer consciousness of guilt. See *Commonwealth* v. *Booker*, 386 Mass. 466, 469 (1982). All in all, the jury could reasonably infer that Ferrer fired the fatal shot. The evidence did not "tend[] equally to sustain either of two inconsistent propositions," as in *Commonwealth* v. *Salemme*, 395 Mass. 594, 601 (1985).

3. *Use of suppressed statements for impeachment purposes.* As noted, Ferrer had fled to Florida, where he found refuge with an aunt. After their investigation, the New Bedford police obtained a juvenile arrest warrant for Ferrer which they placed in the hands of the Metro-Dade Police Department in Miami, Florida. Officers from that department arrested Ferrer at approximately 5 P.M. on January 9, 1992, and took him to headquarters. A police officer made one attempt to call Ferrer's aunt, but she was not at home. At around 6 P.M., Metro-Dade police read Ferrer his Miranda rights, asked if he understood them, and received an affirmative response. Over the next four hours, in a series of interviews with the Florida police, Ferrer told three different stories about the shooting in New Bedford. First, he denied he was at the Dunkin' Donuts. Later, he admitted he was there on the fatal night with Cortes but denied any knowledge of a killing. Still later, he gave a sworn statement to a stenographer in which he admitted the fight with Freitas but said Cortes did the shooting. By virtue of their inconsistency alone, these statements were damaging to Ferrer.

Acting on a pretrial motion, the Superior Court judge, on the authority of *Commonwealth* v. *A Juvenile*, 389 Mass. 128, 134-135 (1983), suppressed evidence of Ferrer's Florida statements. That case held that a juvenile who has reached age fourteen would not be considered to have waived the right to remain silent voluntarily unless there had been "a meaningful consultation with [a] parent, interested adult, or attorney to ensure that the waiver is knowing and intelligent." There had been no such consultation, nor had the prosecution demonstrated that Ferrer possessed the requisite high degree of intelligence, experience, knowledge, or sophistication to make the waiver of a juvenile over age fourteen valid. The judge, however, added on the third

day of trial that should Ferrer take the witness stand, the judge would allow the prosecution to impeach Ferrer with his Florida statements. In so doing, the judge relied on *Commonwealth* v. *Harris*, 364 Mass. at 238 240, which authorized the use of material for impeachment purposes that was otherwise subject to suppression as direct evidence under *Miranda* safeguards.[1] The rationale is twofold: first, the deterrent effect on the police of the exclusionary rule is achieved if the government is deprived of the use of the unlawfully obtained evidence in the case-in-chief; and, second, that "[t]he shield provided by *Miranda* cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances." The quoted material is from *Harris* v. *New York*, 401 U.S. 222, 226 (1971), upon which the Massachusetts *Harris* opinion built.[2]

The defense does not argue that a juvenile is not subject to the *Harris* principle. Rather, the defense urges the application in its favor of a qualification built into the *Harris* principle: namely, that statements, used for impeachment purposes, if not compliant with *Miranda* requirements, must have been made voluntarily. *Commonwealth* v. *Harris*, 364 Mass. at 239. There is a difference between a statement being involuntary for *Miranda* reasons and involuntary because of other overwhelming pressure. A statement may be made in violation of *Miranda* requirements (for example, if an element of the warning is omitted), but be voluntary in the sense that the will of the speaker has not been "unfairly overborne and his capacity for self-determination not critically impaired." *Id.* at 242. See *Commonwealth* v. *Selby*, 420 Mass. 656, 662-664 (1995). Criteria to be applied to sizing up whether statements are voluntary include the defendant's age, education, intelligence, emotional maturity, and experience with the criminal justice system. *Id.* at 663. The trial judge, proceeding on the basis of what he had heard and studied in connection with the suppression motion, found that Ferrer did not have a high degree of intelligence, experience, knowledge or sophistication, but he found as to Ferrer's statement: "It's not the product of any inquisitorial activity or that he's been overborne by violence . . . or trickery. He's not mentally ill. He's not physically impaired. He wasn't sick at the

---

[1] *Miranda* v. *Arizona,* 384 U.S. 436 (1966).

[2] The identity of names of defendants in the two *Harris* cases is a coincidence.

time. The police didn't threaten him. So . . . I don't find that he was coerced in making the statement." Youth and immaturity are relevant factors in determining voluntariness but not conclusive ones. See, e.g., *Commonwealth* v. *Fernette*, 398 Mass. 658, 663-664 (1986); *Commonwealth* v. *Selby*, 420 Mass. at 664. The judge's determination that Ferrer had spoken voluntarily in Miami has support in the record; there was no error.

*Judgment affirmed.*