## COMMONWEALTH VS. LAJUAN MELTON.

No. 99-P-216.

Plymouth. September 7, 2000. - January 2, 2001.

Present: BROWN, GREENBERG, & DUFFLY, JJ.

Further appellate review granted. 434 Mass. 1102 (2001).

*Assault by Means of a Dangerous Weapon. Practice, Criminal,* Sentence.
*Evidence,* Identification, Testimony of third party respecting identification.
*Identification. Joint Enterprise.*

A criminal defendant was correctly charged with four assaults by means of a
dangerous weapon for his firing a single gunshot at a car containing four
passengers traveling at a high rate of speed, and upon conviction, the judge
appropriately within his discretion imposed consecutive sentences.
[640-643]
Evidence at a criminal trial was sufficient to warrant submission of the case
against the defendant to the jury on the theory that he was a principal
[643-646] or a joint venturer [646-647].

COMPLAINT received and sworn to in the Brockton Division of
the District Court Department on April 3, 1998.

The case was tried before *Richard D. Savignano,* J.

*Anne E. Gowen,* Committee for Public Counsel Services, for
the defendant.

*Patrick C. Lee,* Assistant District Attorney, for the
Commonwealth.

BROWN, J. The defendant appeals from his convictions of
multiple offenses arising out of a drive-by shooting.[1] The Com-
monwealth's evidence tended to show that, during a drive-by
incident, one of four occupants of a vehicle fired a single shot
into another vehicle that also contained four occupants. The
judge sentenced the defendant on the counts for unlawful pos-

---

[1]The defendant was convicted of four counts of assault with a dangerous
weapon (G. L. c. 265, § 15[b]), as well as of additional counts charging him
with unlawful possession of a firearm and of ammunition, and malicious dam-
age to a motor vehicle. Counts for armed assault with intent to murder were
dismissed.

session of a firearm and for the assaults to five consecutive terms.[2] The defendant's main contention on appeal is that three of his four assault convictions must be vacated because the evidence showed that the shooter intended to commit, at most, one battery. The defendant also claims that there was insufficient evidence to convict him either as a joint venturer or as a principal on the assault counts as well as the count for malicious damage to a motor vehicle.[3] We affirm the convictions.

We rehearse the facts the jury could have found. On the evening of April 1, 1998, Daniel Marcellus (Daniel) was a passenger in a 1991 Honda Accord automobile traveling on Main Street in Brockton. In the vehicle were Daniel's brother Michael, Johnson Danger, Gael Calixce, and Shamond Rowell. As the Honda proceeded down Main Street, it passed the defendant, who was standing in front of a bar with David Benedict, Donald Everett, and Catima Andrews. One or two of the individuals in the latter group "threw their hands up," which Daniel interpreted as a solicitation to engage in a fight. The Honda turned around and came back to where the defendant and his group were standing. Daniel and Michael stepped out of the Honda, and Michael asked what was the problem. There previously had been tension between the defendant and Daniel regarding a friend of the defendant (referred to as "Gerald"), who had been killed in a car accident. Apparently prompted by Michael's suggestion that the dispute be settled, there was an agreement that the defendant and Daniel would fight, "one-on-one." Daniel testified that the defendant took off his jacket and sweater, removed a gun from his waistband,[4] and then wrapped the gun in his sweater or jacket, briefly went out of sight behind a building,[5] and returned, apparently without the weapon.

Daniel and the defendant fought with fists, "blow for blow."

---

[2]Concurrent sentences were imposed on the remaining counts.

[3]The defendant makes no argument on appeal with respect to the possession convictions. Cf. *Commonwealth* v. *Brown, ante* 253 (2000).

[4]Daniel described the gun as "all black," with a seven- or eight-inch long barrel, and stated that it "looked like a Glock." Daniel had seen the weapon before; David Benedict had "pulled it on [Daniel]" during a fight which the two had had a few weeks prior to the present incident. On that occasion, Benedict fired the gun in the air as he was moving away.

[5]Gael Calixce testified that the defendant went into the bar briefly, and when he returned he did not have the jacket in which he had wrapped an object. Shamond Rowell and Michael Marcellus testified that the defendant handed the jacket to someone near an alley.

Shortly thereafter, the parties backed away from each other, the defendant appearing "winded." The defendant's friends, however, encouraged him to continue fighting. The fight apparently had concluded as the police arrived. Both parties apparently emerged relatively unscathed. Daniel told the police that the fight was over and that no weapons had been used. Daniel testified that David Benedict was a passive spectator during this incident and that he did not see Benedict with a weapon.

When the police left, Daniel and his companions drove off in the Honda. After dropping Danger off at his home, Calixce, feeling shaky, asked Daniel to drive. Calixce took the front passenger seat, Michael the rear seat on the driver's side, and Rowell the rear seat on the passenger's side. As the Honda turned on to Summer Street, Daniel observed through the side-view mirror a vehicle coming up "real fast." Daniel testified that the other vehicle crossed into the opposite lane of traffic and came up almost directly abreast of the Honda. He saw a "light-skinned hand coming out the window" next to the rear passenger seat; the hand contained a weapon, the same weapon Daniel had seen the defendant with just prior to their fight. He recognized it because it was all black and had a long barrel. Daniel then heard what sounded like a "cap gun or a firecracker . . . going off."[6] Asked what was his state of mind after he heard the noise, Daniel replied over objection that "[a]t that time [he] just figured it was [the defendant] who shot it. That's what was in [his] head at the time." Daniel testified that after the shot, he looked into the other vehicle, which Calixce later testified was an "old blue Chrysler" which had been seen in the vicinity of the bar at the time of the fight.[7] Daniel stated that Donald Everett was driving, that Catima Andrews was in the front passenger's seat, that David Benedict was in the rear seat, driver's side, and that the defendant occupied the rear seat on the passenger's side. None of the other Honda occupants saw the weapon or was able to identify the persons in the other vehicle, either because the Chrysler's windows were fogged up,

---

[6]Gael Calixce later testified that the bullet shattered a window in the Honda. Officer Richard Linehan testified that he observed evidence of one gun shot which penetrated the Honda's door and shattered a window next to the rear seat.

[7]Neither the blue Chrysler nor the gun nor the spent round was ever found. The bullet presumably went through the rear passenger window of Daniel's vehicle, the only open window in the car.

or because the occupants of the Honda had ducked down after hearing the noise.

After the shot was fired, the other vehicle sped off, and Daniel accelerated in an attempt to obtain the license plate number. After the others in the Honda expressed concern about the possibility of another incident, Daniel drove directly to the police station. He testified that he told the police that he "figured" that it was the defendant who had fired the shot.

The next day, however, when Daniel went to school at Brockton High School, he spoke with several persons, including the defendant's girlfriend, Ruth Andrade, who told him that it was David Benedict who fired the shot.[8] Daniel testified that he began to have second thoughts about his identification of the defendant because the hand which came out of the window was not a "dark-skinned hand," as inferentially that of the defendant was. Daniel testified at the grand jury that he told Officer Linehan and Detective Reardon that it "probably wasn't even [the defendant] who really shot" at the Honda. Officer Linehan subsequently testified that Daniel told him that he wasn't sure at that time if it was the defendant's hand that came out of the window, and that it was Benedict, known to Daniel as "Dag," who was the shooter. Linehan also stated that at the station Daniel told him that he was unable to identify anyone else in the vehicle.[9]

1. *Conviction on four counts of assault by means of a dangerous weapon.* The crime of assault by means of a dangerous weapon requires proof of an overt act "undertaken with the intention of putting another person in fear of bodily harm and reasonably calculated to do so, whether or not the defendant actually intended to harm the victim." *Commonwealth* v. *Domingue*, 18 Mass. App. Ct. 987, 990 (1984). See *Commonwealth* v. *Gorassi*, 432 Mass. 244, 248 (2000) ("the central aspect of an assault is an attempted application of physical force or a threat of the use of physical force, either by an at-

[8]Daniel testified on cross-examination that, on April 2, Benedict approached him at school and "tried to play dumb," asking Daniel what had happened. There was an argument, and school officials pulled them apart. Andrade, the only defense witness, testified that Benedict had approached her and told her that he had fired the shot.

[9]The prosecutor acknowledged in closing argument that the evidence showed that it was "most likely" that Benedict, not the defendant, fired the shot.

tempt to do bodily harm, or by placing the victim in fear of imminent bodily harm").[10] See also *Commonwealth* v. *Musgrave*, 38 Mass. App. Ct. 519, 521-525 (1995), *S.C.*, 421 Mass. 610 (1996).

The defendant was charged with separate counts of assault by means of a dangerous weapon for each of the four occupants of the Honda. He argues that evidence of a single gunshot fired with no warning and followed by the immediate departure of the shooter is not sufficient to prove that the shooter attempted to batter four victims rather than one, and that in these circumstances, it would not have been possible to have shot all four occupants with a single bullet.[11]

*Commonwealth* v. *Dello Iacono*, 20 Mass. App. Ct. 83, 89 (1985), which relied upon *Commonwealth* v. *Levia*, 385 Mass. 345, 347-351 (1982),[12] is instructive on the question presented here.[13] In *Dello Iacono*, *multiple* shots were fired through windows in a residence containing two victims, and the court

---

[10]The verdict slips indicated, with respect to the assault counts, that the jury had based their verdict on the attempted battery theory rather than on the theory of an imminently threatened battery.

[11]The defendant did not make this argument below. This is evident from a "summary of sidebar conference" which is part of an expanded record on appeal. The summary makes clear that, during argument on the defendant's motion for a required finding of not guilty, counsel argued only that there was insufficient evidence presented to establish joint venture. Nevertheless, we review to determine whether there was a substantial risk of a miscarriage of justice.

[12]The *Levia* case was an armed robbery prosecution in which the defendant pointed, but did not fire, a weapon at two store employees. The defendant contended that there was only one robbery and that the imposition of consecutive sentences was improper. The court had to determine whether the Legislature intended that the putting in fear and robbery from two individuals of money belonging to a single entity would constitute one robbery or two. The Commonwealth argued that the armed robbery statute was designed to protect persons, and the court agreed, holding that the offense is against the person assaulted and not the entity that owns or possesses the property taken. *Commonwealth* v. *Levia*, 385 Mass. at 347-351.

[13]We observe that, unlike the present case, the court in *Dello Iacono* did not discuss the question whether the case was prosecuted under the attempted battery theory or the immediately threatened battery theory. This does not change the result we have reached because the issue is whether a defendant may be prosecuted on an offense-per-person theory. We conclude that, if the jury had returned a verdict in the present case on the immediately threatened battery theory, the verdicts would stand. See and compare *Commonwealth* v. *Domingue*, 18 Mass. App. Ct. at 990 ("nothing inconsistent with the jury's having found . . . that the defendant fired the weapon . . . towards the bar

held that the defendant properly could be convicted on multiple counts of assault, and in the judge's discretion, given consecutive sentences. The defendant concedes this point but stresses that the present case is distinguishable because only a *single* shot was fired at the Honda. In *Dello Iacono*, the court referred to the fact that, in the *Levia* case, the court considered the legislative design and held that the number of persons intimidated measured the number of offenses, noting that the offense of armed robbery fell under the statutory heading "Crimes Against the Person," the text defining the person as the object of protection.[14] *Commonwealth* v. *Dello Iacono, supra* at 89.

The decision in *Commonwealth* v. *Gordon*, 41 Mass. App. Ct. 459 (1996), cited by both parties, and involving the offense of armed assault with intent to murder, a specific intent crime, is not inconsistent with these principles. There, the defendant pointed a weapon at two pursuing police officers three times. The defendant may have fired once at the officers, the gun jamming after he had fired the single shot. The court did not accept the defendant's argument that a single act of pointing a gun at the officers and shooting once was insufficient to prove two separate armed assaults with intent to murder. In fact, the court held, it was irrelevant that the weapon jammed because the specific intent is measured at the moment the defendant pointed the pistol at the officers. *Id.* at 465-466. See *People* v. *Mimms*, 40 Ill. App. 3d 942, 945-946 (1976).

The defendant's argument that *Commonwealth* v. *Gordon, supra,* is not dispositive in the present circumstances because it could be inferred that the defendant there intended to fire not one but several shots to accomplish his purpose to kill both officers misses the mark. That the court looks to the legislative intent in these circumstances to determine whether to charge the defendant with multiple counts as the result of a single act is made clear in *Commonwealth* v. *Gordon*, 42 Mass. App. Ct. 601 (1997), a case involving a prosecution under G. L. c. 266, § 14, for armed burglary and assault. The opinion borrowed from the analysis in the *Levia* case but reached a different conclusion.

. . . and that he *also* fully intended to frighten its bartender at the same time, and with the same shots") (emphasis added).

[14]In *Commonwealth* v. *Smiley*, 431 Mass. 477, 480 (2000), the court cited *Commonwealth* v. *Levia, supra,* for the proposition that the Commonwealth is permitted, although not required, to request multiple indictments (or multiple counts, for that matter), in circumstances where there are multiple victims.

The court held that the provisions of the statute that require the burglar to be armed or to commit an actual assault merely aggravate the principal crime of burglary, and therefore there could be only one conviction under that statute no matter how many occupants were assaulted inside the dwelling. *Id.* at 605. See *Commonwealth* v. *Cruz*, 430 Mass. 182, 196 (1999). In *Gordon*, the court took note of the fact that burglary was essentially a crime against a person's possessory interest in his dwelling, and that the Legislature had placed G. L. c. 266, § 14, in the chapter of the General Laws entitled "Crimes against Property." 42 Mass. App. Ct. at 604-605. Contrast *Commonwealth* v. *Dello Iacono, supra.*

Here, the shooter fired at point blank range from a vehicle traveling at a high speed. He endangered the lives of all four occupants in doing so. In these circumstances, the state of the evidence does not suggest that the shooter's intent was to injure Daniel alone.[15]

The teaching of our cases is that, where the intent of the Legislature in the enactment of a criminal statute is primarily to protect the safety of individuals, as opposed to one's possessory interest in property, the number of victims determines the number of units of legitimate prosecution.[16] In the present case, it was not error to charge the defendant with four counts of assault, and the judge within his discretion appropriately could impose consecutive sentences.[17] *Commonwealth* v. *Dello Iacono, supra.*

2. *Sufficiency of the evidence.* a. *Principal liability.* The judge charged the jury, without challenge, that the defendant could be found liable as either a principal or a joint venturer on the counts for assault and for malicious damage to an automobile. The jury returned a general verdict. See *Commonwealth* v. *Ellis*, 432 Mass. 746, 761-762 (2000) (jury not required to conclude

---

[15]We observe for what it is worth that Daniel was driving and that the shot penetrated the rear seat area of the car.

[16]The annotation, Single Act Affecting Multiple Victims as Constituting Multiple Assaults or Homicides, 8 A.L.R. 4th 960 (1981), collects cases which indicate that courts in various jurisdictions are not in agreement as to whether a single act affecting multiple victims constitutes multiple assaults or rather a single offense.

[17]The record on appeal discloses that the defendant, while arguing for lesser offenses, did not object to the imposition of the consecutive sentences at the time they were imposed. Nor does the District Court docket indicate that the defendant filed a motion to revise or revoke the sentences.

unanimously that the defendant was either the principal or the joint venturer). Hence, "[u]nder either theory, the Commonwealth must present sufficient evidence at trial to prove beyond a reasonable doubt each element of that theory." *Commonwealth* v. *Green,* 420 Mass. 771, 779 (1995). See *Commonwealth* v. *Ellis, supra* at 761.

The defendant argues that there was insufficient evidence to warrant submission to the jury on the theory that he was a principal, observing that the Commonwealth "essentially conceded" that the evidence was insufficient to prove that he was the shooter. He also points out that the verdict slips did not require the jury to record what theory, principal or joint venture, they were convicting on. Therefore, the defendant maintains, as it cannot be ascertained whether the defendant was convicted on a theory for which there was no evidentiary support, the convictions must be vacated.

As noted, the record indicates that the defense challenged joint venture liability. The record does not indicate that the defense counsel discussed principal liability. "The relevant question is whether the evidence would permit a jury to find guilt [on the basis of principal liability], not whether the evidence requires such a finding." *Commonwealth* v. *Brown,* 401 Mass. 745, 747 (1988).

Daniel testified at trial that he told the police at the Brockton police station that he "figured it was [the defendant] who had shot." As to his percipient observations, Daniel was only able to state that he saw a light-skinned hand containing a weapon coming out of the window next to the rear seat on the passenger's side, and although he stated that the defendant was in the rear passenger seat, he did not directly connect the defendant to the hand coming out the window with the weapon. Therefore, Daniel did not testify at trial that he made a positive identification of the defendant as the person who fired the shot.[18] On direct examination, Officer Linehan testified that two hours after the incident, at the Brockton police station, Daniel recounted that "the same party he got in a fight with at Tremont and Main Streets came alongside [the Honda] while it was on Summer Street and fired one shot." The officer further testified that

---

[18]On cross-examination, the judge sustained the prosecutor's objection, on the grounds that it was argumentative, to the question, "[T]here's no question in your mind today that it was not [the defendant's] hand that held that gun, right?"

some time later, "at the grand jury,"[19] the defendant told the police that he was unsure whether the hand that came out of the window was the defendant's, and that he believed at that time that David Benedict was the shooter.

Under *Commonwealth* v. *Daye*, 393 Mass. 55, 60-63 (1984), and related cases, if a witness at trial makes no in-court identification, and disclaims any pretrial identification, third party evidence of a pretrial identification is not admissible for substantive purposes. "Thus, a police officer's attribution to a witness of a positive identification denied by the witness at trial is not admissible to prove the identification. Its effect is limited to impeachment." *Id.* at 61. Therefore, Officer Linehan's testimony at trial that Daniel informed him at the police station that the defendant was the shooter was not admissible as independent substantive evidence of the defendant's guilt, because the evidential value of the prior identification is diminished. See *Commonwealth* v. *Swenson*, 368 Mass. 268, 273 n.3 (1975). Cf. *Commonwealth* v. *Fitzgerald*, 376 Mass. 402, 407-409 (1978) (prior identification of defendants by witness admissible not merely to impeach but as substantive evidence where witness testified at trial that the defendants were not the offenders, but *affirmed that she had made earlier photographic identifications* as to which there was no claim that they were made under suggestive conditions, and thus could be cross-examined concerning them). Compare *Commonwealth* v. *Sineiro*, 432 Mass. 735, 744-745 (2000) (where one of the victims at a probable cause hearing identified the defendant as the person who assaulted her but at trial disclaimed any memory of the defendant's having done so, the judge properly ruled that the victim's probable cause testimony could be admitted in evidence for substantive purposes, the court noting that probable cause testimony, as opposed to grand jury testimony, is inherently more trustworthy and that corroboration is not required).

In the instant case, however, the Commonwealth presented additional circumstantial evidence on the defendant's liability as a principal. *Commonwealth* v. *Daye*, *supra* at 74. See and compare *Commonwealth* v. *Jenkins*, 34 Mass. App. Ct. 135, 145

---

[19]The record is not clear as to whether Daniel testified under oath at the grand jury that he then believed that Benedict was the shooter, or whether the statement came during an interview of Daniel by the police at the time of the grand jury proceedings.

(1993), *S.C.*, 416 Mass. 736 (1994). The defendant and Daniel had a confrontation shortly before the shooting incident. See *Commonwealth* v. *Ferrer*, 47 Mass. App. Ct. 645, 646-647 (1999). Daniel saw the defendant with a weapon just prior to their fight, and he recognized the weapon as the same one brandished by David Benedict on an earlier occasion. The defendant, sitting in the rear passenger seat, was in the best position to fire the shot. *Commonwealth* v. *Ferrer, supra.* Cf. *Commonwealth* v. *Salemme*, 395 Mass. 594, 599-601 (1985). Furthermore, Daniel testified that, on the evening of his confrontation with the defendant, David Benedict was a passive observer of the fight, and that there was no exchange of words or argument between him and Benedict. Although various witnesses testified that there was apparently no clear winner in the fist fight between Daniel and the defendant, Daniel testified that after the defendant "got a couple of blows in," causing Daniel to slip to the ground, he (Daniel) got up and picked up the defendant and slammed him to the ground. At the close the defendant appeared winded, stepped back from the affray, and stood on the curb. In the circumstances, the jury could have inferred that the defendant may have suffered some embarrassment in front of his friends, and that he (the defendant), more than Benedict, had a motive on that occasion to pursue Daniel's vehicle and to fire the shot. *Commonwealth* v. *Ferrer, supra.* "In order to convict on circumstantial evidence, it is not necessary to show that it was not in the power of any other person than the defendant to commit the crime." Cf. *Commonwealth* v. *Salemme, supra* at 601, quoting from *Commonwealth* v. *Fancy*, 349 Mass. 196, 200 (1965) (other citation omitted).

The instant facts clearly distinguish this case from a case such as *Commonwealth* v. *Lane*, 27 Mass. App. Ct. 527, 527-529 (1989), cited by the defendant, in which there was no evidence linking the defendant to the incident beyond the identification testimony, which proved only that one of two individuals committed the crime. We think that, while the question may be considered close, the present case is not one in which the jury could have convicted the defendant on a theory for which there was no evidentiary support. The Commonwealth presented sufficient circumstantial identification evidence to withstand the defendant's motion for a required finding of not guilty as to principal liability and to take the case to the jury.

b. *Joint venture liability.* The test for joint venture is whether

each defendant was (1) present at the scene, (2) with knowledge that another intends to commit the crime, and (3) by agreement is willing and available to help the other if necessary. *Commonwealth* v. *Longo*, 402 Mass. 482, 486 (1988). See *Commonwealth* v. *Caramanica*, 49 Mass. App. Ct. 376, 380-382 (2000), and cases cited. Daniel identified the defendant as being present in the Chrysler at the time of the shooting. That the defendant shared the intent with Benedict (if, indeed, Benedict was the shooter) is demonstrated by the prior hostility between Daniel and the defendant. See, e.g., *Commonwealth* v. *Henderson*, 47 Mass. App. Ct. 612, 613 (1999) (both the defendant and the shooter were in the vehicle, but it was the defendant, not the shooter, who had had a quarrel with the victim). See and compare *Commonwealth* v. *Cohen*, 412 Mass. 375, 380-381 (1992). As to willingness to assist, it was a reasonable inference for the jury to draw that the defendant had supplied the gun to Benedict. This would be enough for joint venture liability. See *Commonwealth* v. *Daughtry*, 417 Mass. 136, 139 (1994). Indeed, the shared possession of the weapon by the defendant and Benedict on various occasions has the aura of a moveable feast. For joint venture liability, it was not necessary for the Commonwealth to present direct evidence as to which one fired the shot, so long as there is strong circumstantial evidence that one of them did. *Commonwealth* v. *Casale*, 381 Mass. 167, 174 (1980). There was sufficient evidentiary support to warrant sending the case to the jury on a theory of joint venture, as well as on principal, liability.

*Judgments affirmed.*