## COMMONWEALTH *vs.* JOHN J. SALEMME.

Suffolk. April 1, 1985. — August 8, 1985.

Present: HENNESSEY, C.J., LIACOS, ABRAMS, NOLAN, & LYNCH, JJ.

*Homicide. Practice, Criminal,* Required finding. *Evidence,* Consciousness
   of guilt.

A defendant on trial for the murder of a man whose body, shot in the head,
   was found seated at a table in a restaurant was entitled to a required
   finding of not guilty where the evidence, viewed in the light most
   favorable to the Commonwealth, left the defendant's guilt to conjecture,
   it appearing that the defendant and another man, both of whom had been
   seen sitting at the table with the victim ten minutes before witnesses
   heard a gunshot, had an equal opportunity to commit the murder. [598-603]

INDICTMENT found and returned in the Superior Court De-
partment on April 6, 1983.

The case was tried before *Robert J. Hallisey,* J.

*Joseph J. Balliro (Robert A. George* with him) for the de-
fendant.

*Leonard Henson,* Assistant District Attorney (*Margaret
Steen Melville,* Assistant District Attorney, with him) for the
Commonwealth.

LIACOS, J.  On April 6, 1983, a Suffolk County grand jury
indicted the defendant, John J. Salemme, for murder. G. L.
c. 265, § 1 (1984 ed.). On Februrary 13, 1984, a jury returned
a verdict of guilty of murder in the first degree on the indict-
ment. The judge sentenced Salemme to life imprisonment at
the Massachusetts Correctional Institution at Cedar Junction.
Salemme appealed to this court. On appeal he argues that the
judge erred in (1) denying the defendant's motion for a required
finding of not guilty; (2) denying his motions for a mistrial;
(3) declining to give a certain instruction offered by the defend-
ant; and (4) excluding the testimony of a defense witness.

Salemme also requests this court to afford appropriate relief under G. L. c. 278, § 33E (1984 ed.). We address only the first of these issues. We hold that the judge erred in denying Salemme's motion for a required finding of not guilty at the close of the Commonwealth's case-in-chief. Accordingly, we reverse the judgment below.

In determining whether the judge erred in denying Salemme's motion for a required finding of not guilty, we consider whether "the evidence is insufficient as a matter of law to sustain a conviction on the charge" of murder in the first or second degree. Mass. R. Crim. P. 25 (a), 378 Mass. 896 (1979). "[The] question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" (emphasis in original). *Commonwealth* v. *Latimore*, 378 Mass. 671, 677 (1979), quoting *Jackson* v. *Virginia*, 443 U.S. 307, 318-319 (1979). See *Commonwealth* v. *Clark*, 378 Mass. 392, 404 (1979).

In keeping with our task, we describe the evidence in the light most favorable to the Commonwealth. In October, 1981, the Commonwealth's first witness, Soon Yen Chin, was a waiter at the Four Seas restaurant in the Chinatown section of Boston. Chin testified as follows. He worked the 6 P.M. to 4 A.M. shift at the restaurant on the night of October 12 and early morning of October 13, 1981. At three o'clock on the morning of October 13, 1981, a man, whom the defense stipulated was Brian Halloran, entered the restaurant and sat at the round table nearest the kitchen. There was nothing on the table when Halloran sat down. Halloran did not request to eat or drink anything at that time. Twenty minutes later, a second man entered the restaurant and sat across from Halloran at the same table.[1] The second man was about five feet, eight or nine inches tall, was thirty-five or forty years old, and was dressed neatly in a suit, shirt, and tie. He had a slim build and black hair. Chin had seen both him and Halloran in the restaurant

---

[1] Chin testified that he did not see the second man arrive; rather, that he first saw the second man sitting at the table across from Halloran.

once or twice before. Chin served this second man a can of Sprite. He also served Halloran a can of Sprite.

Chin testified further that, at approximately 3:45 A.M., a third man, the victim George Pappas, entered the restaurant and sat between Halloran and the second man, with the former to his left and the latter to his right. Chin served Pappas a steak "to go" in a brown paper bag. The three men were talking together in a friendly manner. Chin passed by the table "many times" after Halloran entered, after the second man joined him, and after Pappas entered and the three men sat together. At one point Chin observed Halloran speaking on the telephone by the cash register in the restaurant; he later saw Halloran sitting at the table again. Chin saw no other customers in the restaurant after the third man, Pappas, arrived. In addition to Chin and two cooks, a fourth employee, the manager Barry Wong,[2] was present in the restaurant that night. Two other waiters who worked the 6 P.M. to 4 A.M. shift that night left the restaurant some time between 3:15 and 3:30 A.M. Chin returned to the kitchen at approximately 3:50 A.M. At about 4 A.M., while he was in the kitchen, Chin heard a loud noise which sounded to him like a gunshot. He ducked down and then ran upstairs to a storage room with the two cooks.

Sergeant Stephen A. Murphy, of the Boston police department homicide unit, testified that he entered the Four Seas restaurant at approximately five o'clock on the morning of October 13, 1981. There were a number of people in the restaurant when he arrived, mostly police officers. Murphy observed the body of Pappas seated at a large round table with his face down on the table in a large pool of blood. Murphy also observed a puncture wound above the victim's right eye. On cross-examination Murphy testified that Chin had described the second man who entered the restaurant as "a white male, 35 to 40, 5 foot 9, beer belly."[3]

---

[2] Barry Wong was unavailable to testify.

[3] This description was inconsistent with Chin's testimony that the second man, allegedly the defendant, was "slim." The defendant had no "beer belly" at trial. There was no evidence of a pretrial identification of the defendant. Chin was not asked to identify the defendant at the trial. Cf. Commonwealth v. Amado, 387 Mass. 179, 186-187 (1982).

Officer Joseph T. Sullivan, from the Boston police department identification unit, testified that he had arrived at the Four Seas restaurant at approximately 4 A.M. on the morning of October 13, 1981, and dusted for fingerprints at various parts of the restaurant. He found a "very good latent fingerprint" on a Sprite can which had been located on the table "on the right-hand side of [the] victim." The defendant, Salemme, stipulated that this print on the Sprite can was his thumbprint. On cross-examination, Officer Sullivan stated that he also found fifteen partial prints on the can and on other items found at the scene of the crime. Sergeant Arthur M. Leets, an officer in charge of the latent fingerprint unit of the Boston police department, testified on cross-examination that he was not able to identify the other partial prints on the Sprite can, or any of the other partial prints on other items in the restaurant that he examined. He stated that he had not attempted to compare the other partial prints on the Sprite can with the fingerprints of Soon Yen Chin, the waiter.

Dr. George Curtis, a medical examiner in Suffolk County at the time of the homicide, was qualified by the judge as an expert witness. Dr. Curtis testified that on the early morning of October 13, 1981, he observed the body of the victim "slumped over the table, sitting in a chair." He performed an autopsy on the body. In Dr. Curtis's opinion, the victim died as a result of a gunshot wound to his head. The witness opined that the victim was shot while seated in the same position at the table at which his body was discovered, and that his death was "quite sudden." Dr. Curtis stated also that "the bullet entered the right eye and took a course to the left, slightly upward and to the back." Dr. Curtis agreed that the bullet's angle of entry and trajectory through the head was "consistent with a bullet being fired from the right side" of the victim. On cross-examination, Dr. Curtis testified that the evidence was also "possibly" consistent with the bullet being fired from the left of the victim, if the victim had turned his head to the left such that the right side of his head faced left. The person firing the bullet would have had to be to the right of the victim's head. Dr. Curtis observed no powder burns on the victim's

face and concluded, as a result, that the shot was fired from over three feet away and that it could have been fired from six or nine feet away.

The Commonwealth introduced considerable evidence of the defendant's apparent flight, which tended to show consciousness of guilt. A warrant for Salemme's arrest was issued on November 6, 1981. A bulletin stating that Salemme was wanted was circulated within the Boston police department. On February 12, 1982, a local television station broadcast a story indicating that the police officers were looking for Salemme. Salemme's picture appeared in a local newspaper several times, with the information that the police officers were searching for him. Sergeant Murphy, Sergeant John Doris, Detective Thomas F. Cashman, and other officers testified as to their efforts to locate the defendant at places where he had been known to visit previously and at his residence. As described by one of the officers, Robert L. Chenette, the effort to locate the defendant was an "intensive investigation." These various efforts were unavailing, and the police officers did not locate Salemme. Officer Paul Rams testified that he was on duty and was responsible for booking Salemme on March 21, 1983, when Salemme surrendered to the police officers.[4]

The case was submitted to the jury with instructions that they could find the defendant guilty of murder in the first degree (by premeditation), murder in the second degree, or not guilty. The Commonwealth did not argue that the murder was a joint venture between Salemme and Halloran.[5] See *Com-*

---

[4] There was additional evidence as to the following. Keys to an automobile which Halloran had borrowed from a friend and to Halloran's apartment were found under the table on the floor of the restaurant, to the left of the victim. Police officers found seventeen live rounds of ammunition in Halloran's apartment but, according to the testimony of Officer William Carter, an expert ballistician, none of the bullets found was of exactly the same type as the bullet which killed the victim. Some of the bullets were, however, .38 caliber, the same caliber bullet that was extracted from the victim's body. There was no evidence that the murder weapon was ever found.

A warrant was issued for Halloran's arrest; he surrendered at the Suffolk County Courthouse on October 29, 1981. Halloran was dead at the time of Salemme's trial in February, 1984.

[5] The Commonwealth waived the joint venture theory at a bench conference at the close of the Commonwealth's evidence.

*monwealth* v. *Casale*, 381 Mass. 167, 172-175 (1980). The Commonwealth's theory was that Salemme himself administered the fatal shot to the victim's right eye. The evidence, viewed in the light most favorable to the Commonwealth, established that Salemme was the "second man" in the restaurant. The jury could infer Salemme's presence from his thumbprint on the Sprite can and from Chin's description of the second man. *Commonwealth* v. *Clark*, 378 Mass. 392, 404-406 (1979). *Commonwealth* v. *LaCorte*, 373 Mass. 700, 702-703 (1977). The jury could also infer, from the testimony of Chin and Dr. Curtis, that the victim sat between Salemme and Halloran, with Salemme on his right, and that the victim was shot from the right side of his head. Moreover, viewed in the light most favorable to the prosecution, the evidence also warranted a jury's finding that after October 13, 1981, the date of the murder, Salemme did not return to an apartment where he lived, did not go to any of the restaurants, cafés, and other addresses where he was usually found, and successfully eluded the police officers who were searching for him until he surrendered to the police department on March 21, 1983. Officer Chenette testified that he did not see Salemme in his customary whereabouts after the date of the murder; other officers who testified said that they searched unsuccessfully for Salemme as of the date of the arrest warrant, nearly three weeks after the murder.

No rational trier of fact, see *Commonwealth* v. *Latimore*, 378 Mass. 671 (1979), could conclude, beyond a reasonable doubt, however, that Salemme, rather than Halloran, fired the shot which killed Pappas. Salemme, Halloran, and Pappas were last seen together ten minutes before the shooting. At that time, Salemme was sitting to the right of Pappas, and Halloran was sitting to Pappas's left. The Commonwealth's theory was apparently that the three men remained in these places for a full ten minutes and that Salemme, sitting on the victim's right, fired the shot on the right side of the victim's head, into his right eye. "[I]f, upon all the evidence, the question of the guilt of the defendant is left to conjecture or surmise and has no solid foundation in established facts, a verdict of

guilty cannot stand." *Commonwealth* v. *Fancy*, 349 Mass. 196, 200 (1965), quoting *Commonwealth* v. *O'Brien*, 305 Mass. 393, 401 (1940). For the jury to find the facts according to the Commonwealth's theory, they inevitably had to engage in impermissible conjecture or surmise. What happened during the time the three men were alone and unobserved for ten minutes prior to the murder is unknown. Whether they changed positions, moved about, argued, remained as they were, or left the restaurant, is a matter of conjecture. There was evidence that Halloran had risen from the table earlier to speak on the telephone; the men also could have risen from their seats during the ten minutes when they were unobserved. Evidence that the victim was shot from at least three feet away indicates that he was not shot at extremely close range. While the jury could infer from the testimony of Dr. Curtis, the medical examiner, that Pappas was killed while in his seated position, the jury cannot infer reasonably from that inference that Salemme was also seated or otherwise located on the right of Pappas when Pappas was killed.[6]

Even if the jury could infer that Salemme was still on the victim's right at the time of the murder, reasonable doubts must linger concerning Salemme's guilt. Dr. Curtis testified that the medical evidence was consistent with the victim's being shot from the right side of his head, but he also testified that the victim could have been shot with his head turned in such a way that the right side of his head was turned to the left side of his body. Thus, even if the jury could infer Salemme's presence on Pappas's right at the time of the shooting, a reasonable doubt would remain concerning the direction in which the victim's head was turned, and consequently whether the shooter was to the victim's right or left. Compare *Commonwealth* v. *Goldenberg*, 315 Mass. 26, 31 (1943) (evidence sufficient to support verdict of guilty on murder charge where medical testimony established that attack on victim in

---

[6] Similarly, whether the Sprite can to the right of the body had been left there or moved prior to, or shortly after, the shot was fired, is a matter of speculation.

front passenger seat of automobile "did not come from the rear but came from the direction of the front right door," and defendant had stated that alleged robber, whom defendant had claimed murdered the victim, was seated behind the victim in the back seat of the automobile).

"In order to convict on circumstantial evidence, it is not necessary to show that it was not in the power of any other person than the defendant to commit the crime." *Commonwealth* v. *Fancy, supra,* quoting *Commonwealth* v. *Leach,* 156 Mass. 99, 101-102 (1892). However, in this case there were two persons, Salemme and Halloran, with apparently equal opportunity to commit the murder. Given the Commonwealth's abandonment of a joint venture theory, it had to prove beyond a reasonable doubt that Salemme fired the fatal shot. The Commonwealth presented insufficient evidence for the jury to so conclude. From the evidence presented, either Salemme or Halloran could have fired the shot, and a jury could not conclude, without reasonable doubt, that it was Salemme and not Halloran. "When the evidence tends equally to sustain either of two inconsistent propositions, neither of them can be said to have been established by legitimate proof." *Commonwealth* v. *Fancy, supra. Berry* v. *Commonwealth,* 393 Mass. 793, 794-796 (1985) (evidence insufficient as matter of law to prove that defendant killed victim when both he and victim's mother had equal opportunity to kill victim). "Evidence which does not go beyond showing that the defendant had an opportunity to commit the crime is insufficient." *Commonwealth* v. *Curtis,* 318 Mass. 584, 585 (1945). Compare *Commonwealth* v. *Rojas,* 388 Mass. 626 (1983).

In addition to the evidence placing both Salemme and Halloran with the victim ten minutes prior to the murder, the Commonwealth presented considerable evidence of Salemme's absence from places he was known to frequent, including an apartment he apparently lived in with a woman. From this evidence the jury could infer that Salemme had fled. "Evidence of flight indicates consciousness of guilt and is probative of the defendant's guilty state of mind." *Commonwealth* v. *Booker,* 386 Mass. 466, 469 (1982). However, our cases have

stated consistently that a defendant may not be convicted solely on the basis of consciousness of guilt evidence. See *Commonwealth* v. *Booker, supra* at 470; *Commonwealth* v. *Toney,* 385 Mass. 575, 585 (1982); *Commonwealth* v. *Montecalvo,* 367 Mass. 46, 52 (1975); and *Commonwealth* v. *Webster,* 5 Cush. 295, 316-317 (1850). This is because "an innocent man, when placed by circumstances in a condition of suspicion and danger, may resort to deception in the hope of avoiding the force of such proofs." *Commonwealth* v. *Webster, supra* at 317. See *Commonwealth* v. *Toney, supra* at 584-585 (criticizing the assumptions that underlie an inference of guilt from evidence of flight).

In the present case, the Commonwealth presented other evidence in addition to the evidence of flight. As discussed above, however, this other evidence was insufficient to permit the jury to infer that Salemme fired the shot. The evidence of Salemme's flight cannot compensate for the absence of evidence whether Salemme was the one to fire the shot. While "[a]ctions and statements that indicate consciousness of guilt on the part of the defendant are admissible and together with other evidence, *may* be sufficient to prove guilt" (emphasis added), *Commonwealth* v. *Montecalvo, supra,* the evidence in this case, taken as a whole, is not sufficient to sustain the verdict.

"The Due Process Clause of the Fourteenth Amendment 'protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.'" *Francis* v. *Franklin,* 471 U.S. 307, 313 (1985), quoting *In re Winship,* 397 U.S. 358, 364 (1970). The jury could not infer, beyond a reasonable doubt, an essential fact necessary to prove that Salemme was guilty of murder: that he, and not Halloran, fired the shot to the victim's right eye. The evidence presented was "insufficient as a matter of law to sustain a conviction on the charge" of murder in the first or second degree. Mass. R. Crim. P. 25 (a). In view of this conclusion, it is unnecessary

for us to consider the other issues raised by the defendant.[7] The judgment of conviction is reversed, the verdict is set aside, and the case is remanded to the Superior Court for entry of a judgment of acquittal.

*So ordered.*

---

[7] We need not rely on the point, but we note also that, apart from the nature of the homicidal act itself, there was no evidence of deliberate premeditation. The only evidence as to the relationship of the three men on the day of the homicide was that they were engaged in conversation in a friendly manner. The trial judge clearly was aware of the problems in this case when he stated: "At the moment I'm very concerned whether there is sufficient evidence for the jury to conclude that, both that this defendant did the shooting and that he had premediated. I think if there is, it's stretching it to the end, perhaps, of the outer limit."